1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff-Respondent,<br><br>　　v.<br><br>ALAN PHETSADAKONE,<br><br>　　　　Defendant-Petitioner. | CASE NO. 2:96-cr-00616<br><br>ORDER GRANTING CORAM NOBIS<br>PETITION |

## 1. INTRODUCTION

Defendant-Petitioner Chittakone "Alan" Phetsadakone came to the United States as a three-year-old refugee. His family fled persecution in Laos after his father and grandfather assisted the American military. He has lived here ever since. Now 48, he has built a life in Seattle: a 26-year marriage, four American-citizen children, two jobs, and nearly a quarter-century of compliance with the law.

In 1997, when Phetsadakone was barely an adult, alone, and facing federal fraud charges, his attorney gave him bad legal advice. At the detention hearing, counsel told the court he did not "share the opinion … that deportation is almost a certainty" and that he did not "think it's a foregone conclusion that a conviction will

ORDER GRANTING CORAM NOBIS PETITION - 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

automatically result in deportation." Dkt. No. 34-6 (beginning at 1:19). Counsel was wrong. Congress had just amended the law and deportation was now mandatory.

But for twenty-four years, reality seemed to vindicate counsel's misadvice that Phetsadakone was not deportable to Laos. Phetsadakone was released from immigration detention, checked in annually with authorities, and built his life. Then, in 2025, Laos changed course. Phetsadakone was detained, and for the first time, he had cause to investigate whether his guilty plea was constitutionally valid.

He now petitions for a writ of error coram nobis to vacate his conviction, arguing that his attorney's misadvice violated his right to effective counsel. The Government opposes, contending that his delay bars relief.

Coram nobis is an extraordinary remedy, reserved for errors "of the most fundamental character." This is such a case. Phetsadakone's delay was reasonable because he had no cause to question his attorney's advice until events contradicted it in 2025—and he filed this petition within days of discovering counsel's error. Counsel's performance was deficient, as the detention hearing recording establishes. And Phetsadakone has shown prejudice because had he understood what his plea would cost him, he would have rejected it.

To deny relief would be to deport a man to a country he left as a toddler, where he has no family and no ties, because his lawyer misread a statute three decades ago. The law does not require that result. The petition is thus GRANTED. Dkt. No. 32.

## 2.  BACKGROUND

### 2.1  Phetsadakone's personal history.

Phetsadakone was born in Vientiane, Laos, in November 1977. Dkt. No. 38-1 ¶ 1. His family fled Laos three years later, fearing for their lives because his father and grandfather had assisted the U.S. military during the conflict in Laos. *Id*. ¶ 2. The family first fled to Thailand before the United States accepted them for resettlement *Id*. ¶ 3. They arrived in Seattle, Washington, as refugees in January 1981, when Phetsadakone was three-years old. *See id*. ¶ 3. He became a lawful permanent resident as a young child. *Id*. ¶ 4.

Phetsadakone's childhood was marked by tragedy. When he was around 13 years old, his brother died in a tragic accident at home—a loaded gun discharged while the children were examining it, killing Phetsadakone's 14-year-old brother, causing a breakdown in family relations and great trauma. *Id*. ¶ 5. The family suffered significant mental health issues after the accident; his father became reclusive and eventually lost his job, and his mother struggled to care for her children. *Id*. ¶ 6. Shortly after his brother's death, Phetsadakone's parents sent him to Wisconsin to live with his uncle. *Id*. In Wisconsin, he was physically and mentally abused by his uncle. *Id*. ¶ 8. At about 14 years old, he ran away and lived with friends, eventually making his way back to Seattle. *Id*.

Without adult guidance or stability, Phetsadakone "had to find [his] own way and provide for [him]self." *Id*. ¶ 9. Lacking family support and a steady income, he became involved in a fraudulent check-cashing scheme with friends seeking quick money. *Id*. In late 1995, after he had just turned eighteen, his girlfriend became

1    pregnant with his son, adding additional financial stress. *Id*. The scheme involved

2    depositing counterfeit checks into existing bank accounts and withdrawing funds

3    before the fraud was detected. Dkt. No. 34-3 (Sentencing Memorandum) at 1–2. The

4    loss to the victim financial institutions was more than $180,000. Dkt. No. 34-2 (Plea

5    Agreement) at 3.

6    **2.2    The 1996 Detention Hearing and counsel's misstatements.**

7            On November 5, 1996, Phetsadakone appeared before a magistrate judge for

8    his initial appearance and detention hearing. Dkt. No. 34-5 (minute entry). He was

9    eighteen years old. At the hearing, the parties addressed whether Phetsadakone's

10   immigration status made him a flight risk. This discussion was preserved in an

11   audio recording. Dkt. No. 34-6.

12           By the time of the hearing, the Illegal Immigration Reform and Immigrant

13   Responsibility Act ("IIRIRA"), had been signed into law by President Clinton on

14   September 30, 1996—more than a month before the hearing. Dkt. No. 41-1 ¶¶ 29–

15   30. IIRIRA lowered the threshold amount for classifying a fraud offense as an

16   "aggravated felony" from $200,000 to $10,000. *Id*. (citing 8 U.S.C. §

17   1101(a)(43)(M)(i)). The statute also introduced "mandatory deportation" for persons

18   convicted of an aggravated felony, with no possibility of waiver or cancellation of

19   removal. *Id*. ¶¶ 29–31. Because Phetsadakone's fraud offense involved losses

20   exceeding $180,000, his conviction would automatically render him deportable as an

21   aggravated felon. *See id*. ¶¶ 29–33; Dkt. No. 34-2 at 3.

22

23

1    At the detention hearing, prosecutor Carl Blackstone correctly articulated the

2  state of the law:

3       My understanding is that at this juncture, Mr. Phetsadakone will
        essentially be deported if he is convicted of any of these offenses. The
4       deportation is mandatory and there's potentially no possibility for a
        waiver of deportation. It's also my understanding that we don't have a
5       formal deportation treaty yet with Laos and if he's ordered deported he'll
        probably stay in some sort of detention facility pending some sort of
6       agreement with Laos as to where he'll be deported to. So I think that
        impacts critically on his flight risk, Your Honor. He's looking at almost
7       certain deportation[.]

8  Dkt. No. 34-6 (beginning at 1:16).

9       Phetsadakone's appointed counsel, Kenneth Kanev, responded:

10      I don't share the, I guess, opinion of counsel that deportation is almost
        a certainty. True, the immigration laws are in flux and there could very
11      well be a deportation proceeding somewhere down the road. But I don't
        think it's a foregone conclusion that a conviction automatically will
12      result in deportation. Mr. Blackstone touched on one aspect, the fact
        that my client is Laotian and there are no diplomatic relations between
13      our country and the country of Laos at the time. What in effect, from
        what I understand, that relationship or non-relationship, has, is that
14      there are a number of individuals of Laotian citizenship who essentially
        are awaiting deportation. They are not detained. The law only requires,
15      or allows, detention, as I understand it, for up to six months, and then
        parole must be considered by INS. So what we have here is not a
16      certainty of deportation if there is a conviction nor, necessarily, a
        certainty of extended confinement that would necessarily give my client
17      a motive to flee[.]

18  *Id.* (beginning at 1:19:18).

19      Counsel's statements were legally incorrect—deportation *was* a certainty

20  under IIRIRA, which made deportation automatic for aggravated felonies.

21

22

23

ORDER GRANTING CORAM NOBIS PETITION - 5

**2.3    Guilty plea and immigration proceedings.**

On January 10, 1997, Phetsadakone pled guilty to two counts of bank fraud. Dkt. No. 34-2 at 1. The parties stipulated to a loss amount of $180,584. *Id.* at 3. The government moved to depart from the Sentencing Guidelines in exchange for Phetsadakone's cooperation, recommending an eight-month sentence. Dkt. No. 34-3. On March 26, 1997, Phetsadakone was sentenced to time served, 8 months in all. Dkt. No. 34-4 at 2.

On March 28, 1997—two days after sentencing–an immigration judge issued Phetsadakone a Notice to Appear (NTA). Dkt. No. 39 at 4. The NTA placed Phetsadakone in removal proceedings and charged him with removability based on his conviction for an aggravated felony. Dkt. No. 39-1 at 2–4. On May 11, 1998, an immigration judge denied Phetsadakone's applications for relief from removal and ordered him removed to Laos. *Id.* He appealed the removal order. *Id.* In November 2000, the Board of Immigration Appeals ("BIA") dismissed Phetsadakone's appeal, concluding that he was "removable as an aggravated felon" and "not eligible for cancellation of removal." *Id.* He did not seek further judicial review of the BIA's dismissal. *Id.*

**2.4    Release and twenty-four years of compliance.**

On March 6, 2001, Phetsadakone was taken into custody, while immigration authorities sought to remove him to Laos. Dkt. No. 39 at 5; Dkt. No. 38-1 ¶ 18. Immigration authorities could not obtain the necessary travel documents from Laos and concluded that Phetsadakone could not be removed to Laos in the reasonably

foreseeable future. Dkt. No. 39 at 5. On June 25, 2001, Phetsadakone was released from immigration detention under an order of supervision. *Id*. A letter provided to him that day warned: "This decision only changes your custody status. It does not change anything regarding your ultimate deportation. You will be removed as soon as travel arrangements can be made." *Id*. at 5–6.

For the next twenty-four years, Phetsadakone fully complied with the terms of his order of supervision, appearing for all scheduled check-ins and committing no further offenses. Dkt. No. 38-1 ¶ 19. In 1999, he married a United States citizen. *Id*. ¶ 13. Together they raised four children, all of whom are United States citizens. *Id*. He worked steadily at two jobs—at a wine importer and at a textile manufacturing company. *Id*. ¶ 14. He has no remaining family or ties to Laos. *Id*. ¶ 12. During this entire period, the government made no effort to remove Phetsadakone to Laos or any other country.

## 2.5    Changed circumstances and this petition.

In June 2025, Laos began cooperating with United States immigration authorities by issuing travel documents for Laotian citizens subject to removal. Dkt. No. 39 at 6. On July 21, 2025, Phetsadakone appeared at the ICE office in Tukwila for his routine annual check-in. Dkt. No. 38-1 ¶ 20. Without notice, ICE agents detained him and revoked his supervised release. *Id*.

On August 20, 2025, Phetsadakone's counsel obtained the court records from his 1996 criminal case, including the audio recording of the detention hearing. Dkt. No. 41 at 5. Upon listening to the recording and identifying counsel's

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

misstatements, Phetsadakone filed this coram nobis petition two days later, on August 28, 2025. Dkt. No. 32; Dkt. No. 41 at 5. Phetsadakone also filed a habeas petition and motion for temporary restraining order. *Phetsadakone v. Scott et al.,* No. 25-cv-1678-JNW-BAT ("Habeas Case"). This Court granted the TRO, noting that the coram nobis petition "raises serious questions going to the merits." Habeas Case, Dkt. No. 21 at 10.

### 3. LEGAL STANDARD

A writ of error coram nobis is an "extraordinary remedy" available "only under circumstances compelling such action to achieve justice." *United States v. Morgan*, 346 U.S. 502, 511 (1954). It is "a step in the criminal case and not … the beginning of a separate civil proceeding." *Id.* at 505 n.4. The writ exists to correct errors "of the most fundamental character" when allowing the conviction to stand would result in "manifest injustice." *Hirabayashi v. United States*, 828 F.2d 591, 604, 606 (9th Cir. 1987). The writ aids "'those suffering from the lingering collateral consequences of an unconstitutional or unlawful conviction based on errors of fact and egregious legal errors.'" *United States v. Kroytor* ("*Kroytor I*"), 977 F.3d 957, 961 (9th Cir. 2020) (quoting *United States v. Kwan*, 407 F.3d 1005, 1009–10 (9th Cir. 2005). To qualify for relief, a petitioner must establish four requirements: "(1) the unavailability of a more usual remedy; (2) valid reasons for the delay in challenging the conviction; (3) adverse consequences from the conviction sufficient to satisfy Article III's case-and-controversy requirement; and (4) an error of the most fundamental character." *Id.* at 961 (citation modified).

The parties agree that Phetsadakone satisfies the first and third requirements. He is no longer in custody from his federal conviction, making habeas relief unavailable, and the threat of deportation constitutes a continuing adverse consequence. The disputed issues are whether Phetsadakone has shown valid reasons for his delay and whether he has shown fundamental error warranting relief.

## 4. DISCUSSION

### 4.1 Phetsadakone has shown valid and sound reasons for his delay.

The Government's main argument is that Phetsadakone's nearly 25-year delay forecloses relief. According to the Government, Phetsadakone fails to satisfy the second requirement for coram nobis relief—demonstrating valid reasons for not attacking his conviction earlier—because he has known since the BIA's 2000 decision that his conviction rendered him removable. Dkt. No. 39 at 9. The Court disagrees. While the delay here is substantial, it is justified by the circumstances.

#### 4.1.1 The Court's inquiry focuses on when external events contradict counsel's advice.

A coram nobis petition is not subject to a specific statute of limitations. *Kwan*, 407 F.3d at 1012. In fact, the law does not even require a petitioner "to challenge his conviction at the earliest opportunity"— "it only requires [him] to have sound reasons for not doing so" sooner. *Id.* at 1014. Thus, petitioners need only provide a "valid or sound reason[ ] explaining why they did not attack their sentences or convictions earlier." *Id.* at 1012; *see Kovacs v. United States*, 744 F.3d 44, 54 (2d Cir. 2014) ("The critical inquiry is whether the petitioner is able to show

1   justifiable reasons for the delay."). Courts have granted coram nobis relief despite

2   delays of ten years, *see Rewak v. United States*, 512 F.2d 1184, 1185 (9th Cir. 1975),

3   and even forty years, *see Hirabayashi*, 828 F.2d at 605. In each case, the

4   reasonableness of a petitioner's delay turns on an individualized assessment of "the

5   specific circumstances [the petitioner] faced[.]'" *Kroytor I*, 977 F.3d at 961; *see also*

6   *Kwan*, 407 F.3d at 1012–14 (whether a petitioner had valid reasons for delay must

7   be assessed based on the particular circumstances the petitioner faced, rather than

8   by mechanical application of a time-based rule); *United States v. Kroytor* ("*Kroytor*

9   *II*"), 155 F.4th 1132, 1137 (9th Cir. 2025) (reaffirming that a petitioner "must show

10  that he had 'sound reasons' for the delay based on all the facts[.]").

11        The question, then, is what circumstances this Court should examine in

12  assessing the reasonableness of Phetsadakone's delay. The Ninth Circuit's decisions

13  in *Kwan* and *Kroytor II* supply the answer—here, the critical question is not just

14  when Phetsadakone knew of the adverse immigration consequences from his guilty

15  plea, but when he had "reason to conclude that his criminal defense counsel had in

16  fact erred and affirmatively misled him[.]" *Kwan*, 407 F.3d at 1014. This inquiry

17  requires examination of the information actually available to Phetsadakone and the

18  extent to which external events confirmed or contradicted counsel's advice. *See*

19  *Kroytor II*, 155 F.4th at 1137.

20        In *Kwan*, the petitioner asked his defense counsel whether pleading guilty to

21  bank fraud would cause him to be deported. 407 F.3d at 1008. Counsel assured

22  Kwan that although deportation was "technically a possibility," it was "not a serious

23  possibility." Kwan pled guilty in July 1996. *Id*. Two months later, Congress enacted

1    IIRIRA, which expanded the definition of "aggravated felony" to include the

2    petitioner's offense and made deportation mandatory. *Id*. at 1008–09. Counsel never

3    informed Kwan of this change and that his guilty plea would almost certainly cause

4    him to be deported. *Id*. at 1009, 1016. Kwan learned of the government's intent to

5    deport him almost immediately. In May 1997—less than a year after his

6    conviction—the government issued a Notice to Appear, informing Kwan that he was

7    subject to deportation as an aggravated felon. *Id*. at 1009.

8        Yet the Ninth Circuit held that this notice did not trigger an obligation to

9    challenge his conviction. *Id*. at 1013–14. Why? Because Kwan retained immigration

10   counsel and challenged his deportation—and the immigration judge agreed with his

11   defense attorney, ruling that Kwan's conviction was *not* an aggravated felony. *Id*. at

12   1009. It was only when a different immigration judge reached the opposite

13   conclusion in 2001 that Kwan had "reason to conclude that his criminal defense

14   counsel had in fact erred." *Id*. at 1014. Once he learned his attorney's advice was

15   wrong, Kwan immediately sought post-conviction relief. *Id*.

16       The Ninth Circuit held that Kwan's nearly six-year delay in seeking coram

17   nobis relief was reasonable because an authoritative source—the first immigration

18   judge—had *confirmed* rather than *contradicted* his attorney's advice. *Id*.

19       *Kroytor II* presented the opposite situation. There, Kroytor pled guilty to

20   healthcare fraud in 2003. 155 F.4th at 1133. Kroytor asked his attorneys about

21   immigration consequences, and his first attorney, Graysen, told him "not to worry"

22   about his immigration status, urging that Kroytor "had bigger problems, such as

23   avoiding jail time." *Id*. at 1134. After pleading guilty but before sentencing, Kroytor

hired a second attorney, Behesnilian, who told him that immigration authorities would not discover his conviction if he paid his restitution in full, and that this would allow him to avoid removal. *Id.* Kroytor followed this advice, paid restitution before sentencing, and received probation with no jail time. *Id.*

But events *contradicted* counsel's advice at every turn. At Kroytor's plea colloquy, the district judge asked whether he understood that pleading guilty would make him "subject to removal." *Id.* at 1134. Kroytor answered, "yes" and pled guilty. *Id.* Then in 2007, immigration authorities detained Kroytor at the Canadian border and informed him that his conviction rendered him inadmissible to the United States—"specifically contradict[ing] Behesnilian's assurances that if Kroytor paid his restitution in full, immigration authorities would not find out about his conviction." *Id.* at 1134, 1137–38. Despite these warnings, Kroytor did not file a coram nobis petition until 2016—nine years after the border encounter. *Id.* at 1134–35.

The Ninth Circuit held that Kroytor "was put on notice in 2003 (by a federal judge) and in 2007 (by an immigration official) that he could be removed based on his conviction, and at least by 2007 he knew or had reason to question his counsel's advice." *Id.* at 1137. His failure to act for another seven years was unreasonable. *Id.*

The key distinction between *Kwan* and *Kroytor II* is thus not the mere existence of formal immigration proceedings—both petitioners faced them—but whether external, authoritative sources confirmed or contradicted counsel's advice. In *Kwan*, the first immigration judge ruled in the petitioner's favor, validating what his defense attorney had told him. In *Kroytor II*, every external event—the plea

colloquy, the border detention—contradicted what counsel had promised. As the Ninth Circuit explained in *Kroytor II*, *Kwan* "held that Kwan had 'sound reasons' for his delay in filing for post-conviction relief because an *immigration judge* at first confirmed that his lawyer' advice was correct." 155 F.4th at 1137 (emphasis in original). "In contrast, Kroytor did not have any comparably 'sound reasons' to justify his tardiness in filing his coram nobis petition. No judge, immigration or federal, told him that he could not be removed or confirmed his lawyer's errant advice." *Id*.

Phetsadakone's case falls on the *Kwan* side of this line.

### 4.1.2    External events confirmed counsel's practical prediction for twenty-four years.

Phetsadakone's counsel predicted that, as a practical matter, he would not be deported. For twenty-four years, external events confirmed that prediction, giving Phetsadakone no reason to suspect his lawyer had erred.

To be sure, counsel was wrong about the law, as deportation was mandatory at the time, not uncertain. But at the 1996 Detention Hearing, counsel also noted that "there are no diplomatic relations between our country and the country of Laos" and that Laotian citizens "are awaiting deportation" but "are not detained" and that after six months, "parole must be considered." Dkt. No. 34-6. This practical prediction was confirmed when:

- The government could not execute Phetsadakone's removal order in 2001 because Laos would not issue travel documents.

- The government released Phetsadakone from detention after six months, acknowledging that removal could not occur in the reasonably foreseeable future.

- For twenty-four years thereafter, Phetsadakone checked in annually with immigration authorities and was never detained or removed.

- During this entire period, the government made no effort to execute the removal order.

These events confirmed counsel's advice for nearly a quarter century. The Government argues that the BIA's November 2000 decision—which concluded that Phetsadakone was "removable as an aggravated felon" and "not eligible for cancellation of removal"—put him on notice like the border encounter in *Kroytor II* and should have prompted him to investigate counsel's advice and his conviction. Dkt. No. 39 at 9. But the two situations are materially different. In *Kroytor II*, the border patrol encounter directly contradicted counsel's specific advice that paying restitution would prevent immigration authorities from discovery his conviction. The border encounter proved this wrong. The immigration officer not only knew about the conviction but detained Kroytor because of it. That contradiction—between what counsel promised and what actually happened—gave Kroytor reason to suspect counsel had erred.

Here, in contrast, the BIA decision was entirely consistent with counsel's advice. Counsel acknowledged at the detention hearing that "there could very well be a deportation proceeding somewhere down the road" and that removal might be ordered. But his advice was that removal would not actually occur because of the

diplomatic situation with Laos. The June 2001 release letter—warning that Phetsadakone would "be removed as soon as travel arrangements can be made"—reinforced this understanding, as removal depended on travel arrangements that could not be made, exactly as counsel had predicted. What would have contradicted counsel's advice was actual removal, or imminent removal, or a change in the Laos situation. None of that occurred until 2025.

This distinction matters because *Kwan* asked whether external events gave the petitioner "reason to conclude that his criminal defense counsel had in fact erred." 407 F.3d at 1014. A petitioner might understand he is legally removable while still reasonably believing his attorney was right that removal would never actually happen. Counsel's advice here had two components: (1) that deportation was not certain under the statute, and (2) that Laos would not accept deportees even if a removal order was issued. The first part was *wrong* from the start, but the second part proved to be *correct* for over two decades. It is the latter belief—that removal would never actually occur—that needed to be contradicted before Phetsadakone's obligation to investigate arose.

District courts routinely consider petitioners' real-life circumstances when assessing the reasonableness of any delay. In *Hirabayashi*, the Ninth Circuit instructed courts to ground their expectations of "lay person[s]" in reality—not legal sophistication—when it comes to their ability to discover new material that might support a coram nobis petition. 828 F.2d 591 at 605. District courts have applied this principle with appropriate flexibility. *See, e.g.*, *United States v. Schwabland*, No. CR14-223-RSL, 2021 WL 2662327 (W.D. Wash. June 29, 2021) (finding that a

culmination of caregiving duties, death of a family member, family relocation, outbreak of the COVID-19 pandemic, and the birth of a child can contribute to reasonable delay in filing for coram nobis relief*); *United States v. Tinker-Smith,* 765 F. Supp. 3d 1070, 1076 (W.D. Wash. 2025) (unfamiliarity with the legal process and the death of petitioner's son caused reasonable delay in "deploy[ing] the highly unusual writ of error coram nobis"). Phetsadakone's circumstances weigh in his favor. His mother confirms that counsel never discussed deportation with the family—a conversation she would have remembered because "we would have been extremely concerned" given the family's lack of ties to Laos. Dkt. No. 41-2 ¶ 6. And Phetsadakone himself states that he "fundamentally did not understand what deportation even meant." Dkt. No. 38-1 ¶ 16. An eighteen-year-old refugee without family support cannot be expected to second-guess his attorney's legal analysis—particularly when events appeared to confirm that analysis for decades. Phetsadakone's personal and family history would have made any conversation with counsel about the realistic prospect of deportation to Laos an alarmingly memorable conversation.

Phetsadakone's experience is not unusual. He belonged to a recognized category that Jay Stansell, an experienced federal defender, calls "lifers"—individuals with final removal orders to countries that refuse to accept deportees, whose removal orders exist indefinitely on paper while they remain in the United States. Dkt. No. 41-1 ¶ 9. Counsel's advice accurately described how the system operated for people in Phetsadakone's situation.

1    Thus, the record supports the conclusion that Phetsadakone entered his plea

2    with the belief that he would not actually be removed to Laos. And as soon as that

3    advice was contradicted, he acted with haste in filing his coram nobis petition. The

4    combination of these factors distinguishes this case from *Kroytor II* and establishes

5    the "sound reasons" required under *Kwan*.

### 4.1.3    Phetsadakone's prompt action defeats the Government's laches defense.

6
7    The Government alternatively argues that the doctrine of laches

8    independently bars Phetsadakone's petition. Dkt. No. 39 at 11–12; Dkt. No. 47 at 3.

9    According to the Government, it has been "clearly prejudiced" by Phetsadakone's

10   nearly thirty-year delay because "the likelihood that the government could now

11   prove the case originally charged against Phetsadakone is virtually nil," and

12   granting relief would "effectively immunize him from re-prosecution[.]" Dkt. No. 39

13   at 12. The Government contends because Phetsadakone has not rebutted this

14   showing of prejudice, he must show that he exercised reasonable diligence in filing

15   his petition—which he cannot do because he was "put on notice several times after

16   his conviction" that removal was required. Dkt. No. 47 at 3.

17
18   The laches framework is well established. When the government invokes

19   laches as a defense to a coram nobis petition, it "must first show that unreasonable

20   delay prejudiced the government." *Kroytor II*, 155 F.4th at 1136. Both the

21   government's ability to respond to the petition and its ability to mount a retrial are

22   relevant. *Id*. Once the government makes this showing, the burden shifts to the

23

petitioner "to either rebut the government's claim of prejudice or show the delay fell within the petitioner's 'exercise[ of] reasonable diligence' in filing the claim." *Id.*

The Court assumes without deciding that the Government has made a prima facie showing of prejudice. The passage of nearly three decades since Phetsadakone's guilty plea would no doubt complicate any effort to retry the original charges. The question, then, is whether Phetsadakone has shown reasonable diligence.

He has. For the reasons explained above, *see supra* Section 4.1.2, Phetsadakone's delay was reasonable because external events consistently confirmed—rather than contradicted—his counsel's practical prediction for twenty-four years. Unlike Kroytor, who was told by a federal judge at his plea colloquy and by an immigration official at the border that his conviction made him removable, Phetsadakone's lived experience reinforced his attorney's advice: the removal order existed on paper, but would not be executed in reality.

Once circumstances changed, Phetsadakone acted promptly. Within weeks of his detention, he filed a habeas petition and this Court granted a temporary restraining order. Two days after his counsel obtained the 1996 hearing recording and identified counsel's misstatements, he filed this petition. This stands in stark contrast to *Kroytor I*, where the petitioner waited two years after learning that challenging his conviction was his only option, 977 F.3d at 962, and *Kroytor II*, where he waited almost nine years after the border encounter, 155 F.4th at 1137. Rather, this is the kind of diligence that courts credit. *See Kovacs*, 744 F.3d at 54 (finding delay reasonable where petitioner acted promptly once he learned of the

remedy, and observing that "it is improbable that [a petitioner] would have promptly thought about coram nobis, which is as arcane as it is ancient").

The Government's laches defense thus fails.

## 4.2    Whether Phetsadakone's conviction involves an error of the most fundamental character.

The remaining question is whether Phetsadakone's conviction was infected by fundamental error. He argues that he suffered such an error when his attorney affirmatively misadvised him about the immigration consequences of his plea. An "affirmative misrepresentation regarding immigration consequences" satisfies the fundamental error requirement. *Kwan*, 407 F.3d at 1014; *United States v. Chan*, 792 F.3d 1151, 1158 (9th Cir. 2015). To prevail, Phetsadakone must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 669 (1984). He has satisfied both requirements.

### 4.2.1    Counsel's performance was deficient.

The Government argues that Phetsadakone has failed to prove affirmative misadvice because his declaration does not describe what counsel told him directly during plea discussions. Dkt. No. 39 at 13. According to the Government, Phetsadakone "should know what his attorney told him," yet his filings are "tellingly devoid of any description of the discussions he had with his attorney." *Id.* The Government contends that the evidence actually suggests counsel provided *no advice* about immigration consequences—a claim that would be barred under

1

2

3

4

*Chaidez v. United States*, 568 U.S. 342 (2013) (holding that *Padilla v. Kentucky*, 559 U.S. 356, 374 (2010), which required counsel to inform defendants whether a guilty plea carries a risk of deportation, does not apply retroactively to cases on collateral review). This argument misreads the record.

5

6

7

8

9

10

11

12

13

14

15

This case presents contemporaneous evidence of counsel's legal understanding, preserved in his own words. At the November 1996 Detention Hearing, the prosecutor correctly explained that under IIRIRA—already signed into law—deportation was "mandatory" with "no possibility for a waiver." Counsel disputed this in open court, with his eighteen-year-old client beside him: "I don't share the … opinion of counsel that deportation is almost a certainty. True, the immigration laws are in flux, but I don't think it's a foregone conclusion that a conviction will automatically result in deportation. … [W]hat we have here is not a certainty of deportation if there is a conviction." Dkt. No. 34-6. Counsel was wrong. As explained above, IIRIRA made deportation mandatory for Phetsadakone's offense. *See supra* Section 2.2. Counsel was wrong.

16

17

18

19

The Government asks the Court to treat these statements as mere advocacy about flight risk. But counsel was not making tactical arguments he knew to be false—he was expressing his genuine, if erroneous, understanding of the law. The Court concludes this misapprehension infected his representation.

20

21

22

23

The Government is correct that Phetsadakone does not state in so many words, "My attorney told me deportation was not certain." But this evidentiary demand is unrealistic for a case arising nearly thirty years after the relevant events. The recording establishes that counsel believed deportation was *not* a

1    foregone conclusion. There is no evidence his understanding changed before

2    Phetsadakone pled guilty two months later. An attorney who publicly disputes the

3    prosecutor's correct statement would have no reason to say something different in

4    private. To assume otherwise would require imagining that counsel knew he was

5    wrong in open court but privately gave accurate advice. Nothing supports such a

6    reading.

7        Moreover, counsel's statements at the detention hearing were themselves

8    advice. Phetsadakone was present in the courtroom, listening to his attorney argue

9    that deportation was uncertain. A young criminal defendant, without other adult

10   guidance, would reasonably understand his lawyer's statements as reflecting the

11   advice he was receiving. The Ninth Circuit's decision in *Kwan* did not require proof

12   of private attorney-client communications distinct from counsel's statements to the

13   court. *See* 407 F.3d at 1008. The representation that there was "no serious

14   possibility" of deportation was itself the misadvice. *Id.* This Court does not require

15   more of Phetsadakone.

16       The Government points to Phetsadakone's statement that he has "no

17   memory" of counsel discussing deportation and that he "fundamentally did not

18   understand what deportation even meant." Dkt. No. 39 at 14. According to the

19   Government, these statements suggest counsel gave no advice at all. But these gaps

20   reinforce the misadvice theory. If counsel had correctly explained that conviction

21   meant mandatory deportation, that conversation would have been memorable and

22   alarming. That Phetsadakone has no such memory—and that his mother confirms

23

1
2

counsel never raised deportation with the family, Dkt. No. 41-2 ¶¶ 6, 8—is what one would expect when counsel dismissed deportation as speculative.

3
4
5
6

Counsel's recorded statements disputing mandatory deportation, in his client's presence, based on a fundamental misunderstanding of the governing law, constitute the kind of "affirmative misrepresentation regarding immigration consequences" that satisfies the deficient performance prong under *Strickland*.

7
8

### 4.2.2    Counsel's deficient performance prejudiced Phetsadakone.

9
10
11
12
13
14
15
16

Phetsadakone must also show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The Government argues he cannot satisfy this requirement because he provided no "contemporaneous evidence" of his priorities during plea negotiations, and because rejecting the plea would have been irrational given the strength of the evidence against him. Dkt. No. 39 at 17. Neither argument survives scrutiny under *Lee v. United States*, 582 U.S. 357 (2017).

17
18
19
20
21
22
23

In *Lee*, the defendant pled guilty to a drug offense after his attorney incorrectly assured him he would not be deported. 582 U.S. at 361. He had lived in the United States for thirty-five years after arriving as a child and had no ties to his country of origin. *Id.* at 357. The Supreme Court held that he could establish prejudice even though he had no viable defense and faced almost certain conviction. *Id.* at 366, 369. As the Court explained, "there is more to consider than simply the

1   likelihood of success at trial," because for noncitizens, "'preserving the client's right

2   to remain in the United States may be more important to the client than any

3   potential jail sentence.'" *Id*. at 367, 370 (quoting *Padilla*, 559 U.S. at 368). When

4   deportation is the determinative factor, the question is not whether trial would have

5   succeeded, but whether rejecting the plea would have been rational—even if it

6   meant "throwing a 'Hail Mary.'" *Id*. at 367–68.

7       The Supreme Court did "look to contemporaneous evidence to substantiate

8   [the] defendant's expressed preferences." *Id*. at 369. But the Court also considered

9   the defendant's life circumstances in finding prejudice. *Id*. at 369–70 (finding

10  prejudice where defendant had lived in United States for nearly three decades, had

11  established businesses and family ties, and had no remaining connections to his

12  country of origin).

13      Like the defendant in *Lee,* Phetsadakone's circumstances leave no doubt that

14  deportation would have been determinative. He has lived in the United States since

15  age three, has no ties to Laos, and faced permanent separation from everyone he

16  has ever known. Deportation would have meant permanent separation from

17  everyone he has ever known. Even if he faced near certain conviction at trial, as the

18  Government contends, rejecting certain deportation in favor of uncertain trial

19  prospects would have been entirely rational for an eighteen-year-old facing

20  permanent exile. See *United States v. Rodriguez-Vega*, 797 F.3d 781, 789 (9th Cir.

21  2015) ("It is often reasonable for a non-citizen facing nearly automatic removal to

22  turn down a plea and go to trial risking a longer prison term, rather than to plead

23  guilty to an offense rendering her removal virtually certain.").

ORDER GRANTING CORAM NOBIS PETITION - 23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

And trial was not the only alternative. Stansell attests that immigration-safe pleas were regularly negotiated during this period for "similarly situated non-citizen defendants, charged with similar bank fraud." Dkt. No. 41-1 ¶¶ 44–46. There is no evidence counsel explored this option—because he did not understand it was necessary. *See Kwan*, 407 F.3d at 1016 ("Counsel never explored the option of renegotiating the plea agreement with the prosecution so as to avoid the deportation consequences."). Even if Phetsadakone would not have risked trial, a reasonable probability exists that he would have at least sought a different plea.

Phetsadakone has thus shown a "reasonable probability" that, but for his counsel's errors, he would have rejected the plea, sought a different one, or gone to trial. Any of these alternatives satisfies the prejudice inquiry.

Because Phetsadakone has established both deficient performance and prejudice, he has established ineffective assistance of counsel—an error of the most fundamental character warranting coram nobis relief.

## 4.3    The equities favor relief.

The Court has applied the Ninth Circuit's four-factor test and concludes that Phetsadakone is entitled to coram nobis relief. The broader equitable picture confirms this result. The writ of error coram nobis exists "to achieve justice." *Morgan*, 346 U.S. at 511; *see also, Kovacs*, 744 F.3d at 49 (framing coram nobis relief around, among other things, whether "there are circumstances compelling such action to achieve justice"); *United States v. George*, 676 F.3d 249, 255 (1st Cir.

1

2012) (finding that petitioner must also show that justice demands the use of coram

2

nobis relief).

3

Phetsadakone was three-years old when his family fled Laos as refugees. He

4

grew up in the United States and knows no other country as home. At eighteen—

5

without meaningful adult guidance and by his own account unable to comprehend

6

what deportation even meant—he pled guilty on the advice of counsel who

7

misunderstood the law. He served his sentence. And then, for twenty-four years, he

8

did everything right. He reported annually to immigration authorities. He married

9

and he raised four children, all American citizens. He worked and built a life. The

10

Government, for its part, made no effort to remove him and issued him a work

11

permit to support his family.[1] His life now stands to be upended by a legal error he

12

had no reason to discover and no ability to correct until circumstances beyond his

13

control brought it to light. These are precisely the circumstances that compel action

14

to achieve justice. The equities favor granting the writ.

15

## 5.  CONCLUSION

16

For the reasons stated above, the Court GRANTS Phetsadakone's petition for

17

coram nobis relief and VACATES his conviction for two counts of bank fraud under

18

18 U.S.C. § 1344.

19

20

21

[1] The Government was not without options. Even when Laos refused to accept

22

deportees, the Government retained authority to pursue removal to any country willing to accept the noncitizen, regardless of whether that country was specified in the original removal order. *See* 8 U.S.C. § 1231(b)(2)(E)(vii). The Government never

23

pursued this alternative.

ORDER GRANTING CORAM NOBIS PETITION - 25

Dated this 31st day of December, 2025.

Jamal N. Whitehead
United States District Judge